**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| YVONNE BARNES, PATRICIA DEAN, and ANTONIO MORRIS, individually and on behalf of all others similarly situated, | Case No.: 1:21-cv-06191 |
| Plaintiffs, | **CONSOLIDATED AMENDED COMPLAINT** |
| v. | **CLASS ACTION** |
| UNILEVER UNITED STATES INCORPORATED, | **Jury Trial** |
| Defendant. | |

Plaintiffs Yvonne Barnes, Patricia Dean, and Antonio Morris ("Plaintiffs") bring this Consolidated Amended Complaint against Unilever United States, Inc. ("Unilever" or "Defendant"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

<u>**NATURE OF THE ACTION**</u>

1.      This is a civil class action brought by Plaintiffs on behalf of all consumers who purchased Suave 24-hour Protection Powder aerosol antiperspirant and Suave 24-hour Protection Fresh aerosol antiperspirant products ("Suave Antiperspirants" or the "Products") from Unilever for normal, household use. The Products are defective because they contain the chemical benzene, a known carcinogen that offers no therapeutic deodorant or antiperspirant benefit.

2.      Over the course of several decades, Unilever gained the trust of consumers, who reasonably believe that Unilever's products, including the defective Products at issue, are made with quality materials, and can be used safely, as intended.

3.      Unilever formulates, designs, manufactures, markets, advertises, distributes, and sells the Products to consumers throughout the United States, including in the State of Illinois.

4.      Unilever distributes and sells the Products through various authorized retailers in store and online.

5.      Unilever represents that the Products are safe for their intended use. In reality, the Products contain significant concentrations of benzene, which is a harmful carcinogen.

6.      Benzene is a carcinogen known to cause cancer in humans. Long-term exposure additionally causes harmful effects on the bone marrow, a decrease in red blood cells leading to anemia, and excessive bleeding that can affect the immune system, leading to an increased chance of infection. According to FDA guidance, there is no safe level of benzene, and thus it "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity." FDA, Q3C – 2017 Tables and List Guidance for Industry, https://www.fda.gov/media/71737/download.

7.      According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[1]  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

---

[1] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

8.      FDA guidance provides that "if [benzene's] use is unavoidable in order to produce a drug product with a significant therapeutic advance, then [its] levels should be restricted" to 2 parts per million ("ppm"). *Id.*

9.      The use of benzene in the Products is demonstrably avoidable. Feasible alternative formulations, designs, and materials were available to Unilever at the time it formulated, designed, and manufactured the Products. Critically, such alternative formulations and designs were and are used by other manufacturers to produce and sell non-defective spray deodorants and antiperspirants. In any event, the Products' benzene concentration ranges from 2.30ppm to 5.21 ppm, at most more than two-and-a-half times the FDA concentration limit of 2 ppm.

10.     The Products' benzene contamination was not disclosed to the consumer on the product label, the ingredients list, or otherwise.

11.     Plaintiffs seek damages and equitable remedies for themselves, and for the proposed Classes.

## PARTIES

### A.  Plaintiffs

12.     Plaintiff Yvonne Barnes is a resident and citizen of Chicago, Illinois who purchased and used Suave 24-Hour Protection Powder Aerosol antiperspirant in Illinois within the relevant time period.

13.     Plaintiff Patricia Dean is a resident and citizen of Homewood, Illinois who purchased and used Suave 24-Hour Protection Powder Aerosol antiperspirant in Illinois within the relevant time period.

14.     Plaintiff Antonio Morris is a resident and citizen of Chicago, Illinois who purchased and used Suave 24-Hour Protection Fresh Aerosol antiperspirant in Illinois within the relevant time period.

**B. Unilever**

15.     Defendant Unilever United States, Inc. is part of an international consumer goods company, the Unilever Group, which consists of two parent companies, Unilever NV and Unilever PLC, together with group subsidiaries, and operates as a single economic entity.

16.     Unilever NV is a public limited company registered in the Netherlands, which has listings of shares and depositary receipts for shares on Euronext Amsterdam and of New York Registry Shares on the New York Stock Exchange.

17.     Unilever PLC is a public limited company registered in England and Wales which has shares listed on the London Stock Exchange and, as American Depositary Receipts, on the New York Stock Exchange.

18.     The Unilever Group has company headquarters in Rotterdam, Netherlands, London, England, and the United States. The Unilever Group operates in the United States under its subsidiary Unilever United States, Inc., a corporation headquartered and located at 800 Sylvan Avenue, Englewood Cliffs, NJ 07632, incorporated within the State of Delaware with entity number 0842944, and registered with the New Jersey Secretary of State with entity number 0100400419.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and Unilever are citizens of different states.

20.     This Court has personal jurisdiction over Unilever because it has substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct,

substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, because Unilever placed the Products into the stream of commerce directed at this District, and because Unilever purposely availed itself of the laws of the United States and the State of Illinois.

21.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Unilever transacts business in this District, and Unilever has intentionally availed itself of the laws and markets within this District.

## **FACTUAL ALLEGATIONS**

### **A. Unilever's History in the Industry**

22.     Unilever is a large multinational consumer goods company known for its wide range of personal care and hygiene products, including the antiperspirant Products at issue here.

23.     Unilever owns over 400 brands, and its products are available in 190 countries.

24.     Unilever's products, including its Suave product line, are manufactured, distributed, and sold throughout the United States, including the State of Illinois.

25.     Unilever gained consumers' trust over the last 130 years, and, according to the company, 2.5 billion people use its products each day.[2]

26.     Unilever achieved worldwide sales of €50.7 billion (approximately $61.9 billion) in 2020, which 42% was specifically derived from personal care products.

27.     Unilever markets and sells aerosol deodorant and antiperspirant as part of its Suave product line. Unilever has sold Suave personal care products for the last 75 years, and, according

---

[2] https://www.unilever.com/Images/ir-q4-2020-full-announcement_tcm244-558959_en.pdf (last visited Nov. 10, 2021).

to Unilever, "the brand has provided high-quality, value products that work as well as premium brands."[3]

28.     Unilever's website emphasizes that "[t]he safety of our products is our top priority. That is why each new product innovation is evaluated systematically and scientifically by our team in the Safety and Environmental Assurance Centre (SEAC). Our scientists consider any safety risks to the consumers who use our products, to the workers who make them, and to the environment to ensure all our products are safe to use."[4]

**B. The Products**

29.     Deodorant is a product applied to the body to prevent or mask the odor of perspiration. Antiperspirants, a subclass of deodorants, prevent sweat glands from producing sweat. The Products are both deodorants and antiperspirants applied to the body as a spray.

30.     The U.S. Food and Drug Administration ("FDA") classifies and regulates most deodorants, including the Products, as cosmetics.  In addition, the FDA classifies and regulates antiperspirants, including the Products, as a drug.

31.     Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies are obliged to prevent defective products that contain them from reaching consumers. Valisure is a company with a core mission "to independently check the chemical composition of medications and healthcare products before they reach consumers."[5]  In order to

---

[3] https://www.unileverusa.com/brands/beauty-personal-care/suave/ (last visited Nov. 10, 2021).

[4] https://www.unilever.com/planet-and-society/safety-and-environment/keeping-people-and-the-environment-safe/ (last visited Nov. 10, 2021)

[5] Valisure.  Valisure Detects Benzene in Body Spray Products (November 4, 2021) (https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-body-spray-products-3/)

do this, Valisure operates an analytical laboratory registered with the FDA and accredited by the International Organization for Standardization.

32.     Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine ("NDMA") in ranitidine, NDMA in metformin, benzene in hand sanitizers, and benzene in sun care products.  Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by industry and led to recalls by manufacturers over the subject products.

33.     On November 3, 2021, Valisure petitioned the FDA to address the dangerous levels of benzene in Unilever's Products and other deodorants and antiperspirants based upon rigorous testing it conducted on a number of spray deodorant and antiperspirant products.[6] The next day, Valisure released the results of these tests.[7]

34.     Valisure's testing found average concentrations of benzene above the FDA concentration limit of 2 ppm in 16 spray deodorants, including the Products which are manufactured and sold by Unilever under its Suave brand.  Valisure's test results have also been confirmed by recalls of several antiperspirant products, including those manufactured by Procter & Gamble and Helen of Troy.  Unilever, however, has refused to voluntarily recall its Products adulterated with benzene.

35.     Valisure specifically measured benzene concentrations of 5.21 ppm in Suave 24 Hour Protection Powder Aerosol.

---

[6] https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf (last visited Nov. 9, 2021).

[7] https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-body-spray-products-3/ (last visited Nov. 8, 2021).

| Brand | UPC | Lot | Expiration | Description | Average ppm |
|-------|-----|-----|------------|-------------|-------------|
| Suave | 079400751508 | 07151AD14 | 07/2023 | 24 Hour Protection, Powder, Aerosol | 5.21 |
| Suave | 079400785503 | 08091AD00 | 08/2023 | 24 Hour Protection, Fresh, Aerosol | 2.30 |
| Suave | 079400785503 | 08091AD02 | 08/2023 | 24 Hour Protection, Fresh, Aerosol | 2.24 |
| Suave | 079400784902 | 08141AD00 | 08/2023 | 24 Hour Protection, Powder, Aerosol | 0.97 |

**C. Danger Posed by Unilever's Products**

36.     The Centers for Disease Control and Prevention ("CDC") has widely documented the carcinogenic properties of benzene. *See* CDC, Facts About Benzene (2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

37.     The U.S. Department of Health and Human Services (DHHS) has also determined that benzene causes cancer in humans. For example, long-term exposure to high levels of benzene can cause leukemia.

38.     Long-term exposure to benzene additionally causes harmful effects on the bone marrow and can cause a decrease in red blood cells, which leads to anemia.  Long-term benzene

exposure can also cause excessive bleeding and can affect the immune system, which increases an individual's chance for infection.

39.     Due to these significant health risks posed by benzene, the World Health Organization and the International Agency for Research on Cancer classify it as a Group 1 compound that is "carcinogenic to humans."[8]

40.     Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[9]

41.     According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[10]  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

42.     The FDA classifies benzene as a Class 1 compound.[11]  According to FDA guidance: "Solvents in Class 1 should not be employed in the manufacture of drug substances, excipients, and drug products, because of their unacceptable toxicity or their deleterious environmental effect."[12]

---

[8] https://www.who.int/water_sanitation_health/dwq/chemicals/benzenesum.pdf (last visited Nov. 7, 2021).

[9] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[10] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

[11] https://www.fda.gov/media/71737/download (last visited Nov. 7, 2021).

[12] *Id.*

43.     The FDA has set a concentration limit for benzene at 2 ppm *only* "if their use is unavoidable in order to produce a drug product with a significant therapeutic advance."[13] The Products, which do not provide any significant therapeutic advance, contain levels of benzene above this limited exception.

### D. Unilever's Representations

44.     Unilever makes a significant number of representations regarding the safety of the Products on their website. Unilever assures consumers that, "[t]o keep people safe, we conduct two types of consumer safety risk assessment: ingredient safety and microbiological safety. Ingredient safety assessments evaluate the potential effects an ingredient in our products could have on the body."[14] Although the Products were found to contain benzene concentration that far exceed the FDA limit, Unilever does not list benzene among the active or inactive ingredients anywhere on its website,[15] and nothing on the Products' labels otherwise insinuate, state, or warn that the Products contain benzene:

---

[13] *Id.*

[14] https://www.unilever.com/planet-and-society/safety-and-environment/keeping-people-and-the-environment-safe/ (last visited Nov. 10, 2021).

[15] https://smartlabel.unileverusa.com/079400784902-0001-en-US/index.html (Suave 24-Hour Protection Powder Aerosol) (last visited March 2, 2022); https://smartlabel.unileverusa.com/079400785503-0001-en-US/index.html (Suave 24-Hour Protection Fresh Aerosol) last visited March 2, 2022)

**Drug Facts**

**Active ingredient**                                    **Purpose**
Aluminum Chlorohydrate (19.1%)..............................anti-perspirant

**Uses**
• reduces underarm wetness
• 24 hour protection

**Warnings**
• FLAMMABLE UNTIL FULLY DRY. DO NOT USE NEAR HEAT, FLAME OR WHILE SMOKING. CAN CAUSE SERIOUS INJURY OR DEATH.
• Keep away from face and mouth to avoid breathing in.
• Avoid spraying in eyes. Contents under pressure. Do not puncture or incinerate. Do not expose to heat or store at temperatures above 120°F/50°C or in enclosed places that could overheat.
• Do not use on broken skin. Stop use if rash or irritation occurs.
• Ask a doctor before using if you have kidney disease.
• KEEP OUT OF REACH OF CHILDREN.
• USE ONLY AS DIRECTED. INTENTIONAL MISUSE BY DELIBERATELY CONCENTRATING AND INHALING THE CONTENTS CAN BE HARMFUL OR FATAL. Help stop inhalation abuse. For information visit www.inhalant.org

**Directions**  apply to underarms only

**Inactive ingredients**
Butane, Cyclopentasiloxane, Hydrofluorocarbon 152a, Isopropyl Palmitate, Talc, Disteardimonium Hectorite, Isobutane, Fragrance (Parfum), Propylene Carbonate, Propane

**Questions or comments?**
Call us at 1-800-782-8301

[16]

### E. Unilever's Products Are Adulterated and Illegal to Sell

45.     Unilever's antiperspirant Products are adulterated drugs under 21 U.S.C. § 351(a)(1) based upon the presence of benzene.

---

[16] https://www.walmart.com/ip/Suave-24-Hour-Protection-Anti-Perspirant-Deodorant-Spray-Powder-4-oz-Pack-of-3/902544007 (last visited Nov. 17, 2021) (Suave 24-Hour Protection Powder Aerosol)(Note: the ingredient list for the Suave 24 Hour Protection Fresh Product is identical in the relevant sections. *See* https://www.walmart.com/ip/Suave-24-Hour-Protection-Anti-Perspirant-Spray-Fresh-6-oz/10804526)

46.     The Federal Food, Drug, and Cosmetic Act ("FDCA") prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

47.     The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/14 is exactly the same as the FD&C Act.

48.     As alleged herein, Unilever has violated the FDCA, the IL FDCA, the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), other parallel state statutes, and consumer protection statutes.

49.     Unilever engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its omissions surrounding benzene contamination affecting the Products.

50.     No reasonable consumer, including Plaintiffs, would have purchased the Products had they known of the material omissions of material facts regarding the presence of benzene. Accordingly, Plaintiffs and the Classes suffered injury in fact and lost money as a result of Unilever's misleading representations and omissions and did not receive the benefit-of-the-bargain.

51.     Plaintiffs and the Classes' injury is underscored by the fact that numerous other products offering the same therapeutic benefit at comparable prices exist that are not contaminated with benzene.

52.     Plaintiffs and the Classes may be harmed again because they want to purchase the Products in the future; however, without injunctive relief Plaintiffs would not be able to know or trust that Unilever will truthfully and legally label the Products and would likely be misled again.

12

## PLAINTIFFS' FACTUAL ALLEGATIONS

**PLAINTIFF YVONNE BARNES**

53.     Plaintiff Yvonne Barnes has purchased Suave 24-Hour Protection Powder Aerosol antiperspirant regularly for several years, approximately every 2 to 3 weeks.  The last time Plaintiff Barnes purchased the Product was in or around the end of October 2021.  Plaintiff Barnes purchases the Product at Walmart, Target, CVS, and Walgreens located in Chicago, Illinois and Oak Park, Illinois.

54.     Nowhere on the packaging did Unilever disclose that the Product contained benzene at the time of purchase.

55.     When purchasing the Product, Plaintiff Barnes reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Plaintiff Barnes relied on these representations and warranties in deciding to purchase the Product manufactured by Unilever, and these representations and warranties were part of the basis of the bargain in that, had Plaintiff Barnes been aware of the existence of benzene in the Product, she would not have purchased the Product or would have paid significantly less.

56.     As a result of Unilever's actions, Plaintiff Barnes has incurred damages, including economic damages.

**PLAINTIFF PATRICIA DEAN**

57.     Plaintiff Patricia Dean has purchased Suave 24-Hour Protection Powder antiperspirant regularly for the last 5 years, approximately 3 to 4 times each year.  Plaintiff Dean most recently purchased the Product in or around May or June 2021.  Each time Plaintiff Dean purchased the Product, she did so at the Walmart in Homewood, Illinois.

58.     Nowhere on the packaging did Unilever disclose that the Product contains benzene at the time of purchase.

59.     When purchasing the Product, Plaintiff Dean reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Plaintiff Dean relied on these representations and warranties in deciding to purchase the Product manufactured by Unilever, and these representations and warranties were part of the basis of the bargain in that, had Plaintiff Dean been aware of the existence of benzene in the Product, she would not have purchased the Product or would have paid significantly less.

60.     As a result of Unilever's actions, Plaintiff Dean has incurred damages, including economic damages.

**PLAINTIFF ANTONIO MORRIS**

61.     Plaintiff Antonio Morris has purchased Suave 24-Hour Protection Fresh Aerosol antiperspirant regularly for several years, approximately four times a year.  The last time Plaintiff Morris purchased the Product was in or around January 2022.  Plaintiff Morris purchases the Product at Walgreens stores located in Chicago, Illinois.

62.     Nowhere on the packaging did Unilever disclose that the Product contains benzene at the time of purchase.

63.     When purchasing the Product, Plaintiff Morris reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Plaintiff Morris relied on these representations and warranties in deciding to purchase the Product manufactured by Unilever, and these representations and

14

warranties were part of the basis of the bargain in that, had Plaintiff Morris been aware of the existence of benzene in the Product, he would not have purchased the Product or would have paid significantly less.

64.     As a result of Unilever's actions, Plaintiff Morris has incurred damages, including economic damages.

## CLASS ACTION ALLEGATIONS

65.     Plaintiffs bring this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class:** All persons in the United States who purchased the Products for personal consumption from the beginning of any applicable limitations period through the date of judgment.

> **Consumer Fraud Multi-State Class:** All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Products for personal consumption from the beginning of any applicable limitations period through the date of judgment (the "Consumer Fraud Multi-State Class").[17]

> **Illinois Subclass:** All persons in the State of Illinois who purchased the Products for personal consumption from the beginning of any applicable limitations period through the date of judgment.

66.     Members of the classes described are referred to as "Class Members" or members of the "Classes."

---

[17] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

67.     The following are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Unilever, Unilever's subsidiaries, parents, successors, predecessors, and any entity in which Unilever or its parent has a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Unilever's counsel; (6) the legal representatives, successors, and assigns of any such excluded persons; and (7) resellers of the Products.

68.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

69.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On information and belief, Class Members number in the thousands to millions. The precise number or identification of members of the Classes are presently unknown to Plaintiffs but may be ascertained from Unilever's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

70.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to, the following:

a)  Whether the Products contain benzene at the time of purchase;

b)  Whether Unilever omitted or failed to disclose material information to Plaintiffs and Class Members regarding the Products;

c) Whether the Products are defectively designed, formulated, and/or manufactured;

d) Whether Unilever knew or reasonably should have known about the harmful level of benzene in the Products prior to distributing and selling them to Plaintiffs and Class Members;

e) Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive;

f) Whether Unilever's actions violate the consumer protection statutes invoked herein;

g) Whether Unilever breached the implied warranty of merchantability relating to the Products;

h) Whether Unilever breached an express warranty to Plaintiffs and Class Members;

i) Whether Unilever was unjustly enriched at the expense of the Plaintiffs and Class Members;

j) Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

k) Whether Plaintiffs and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

l) Whether Plaintiffs and the Class Members are entitled to injunctive, declaratory, or other equitable relief.

71.     Unilever engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

72.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Unilever in violation of law as

complained of herein. Further, the damages of each Class Member were caused directly by Unilever's wrongful conduct in violation of the law as alleged herein.

73. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Classes because they are members of the Classes and their interests do not conflict with the interests of the Class Members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

74. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Unilever, so it would be impracticable for Class Members to individually seek redress for Unilever's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation of the State Consumer Fraud Acts**
**(On Behalf of Plaintiffs and the Consumer Fraud Multi-State Class)**

75.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

76.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

77.     Plaintiffs and the other Members of the Consumer Fraud Multi-State Class have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Class because Plaintiffs and Members of the Consumer Fraud Multi-State Class have suffered an injury in fact and lost money as a result of Unilever's actions set forth herein.

78.     Unilever engaged in unfair and/or deceptive conduct, including, but not limited to, making material misrepresentations and omissions regarding the Products, as described above,  in violation of the FDCA.

79.     Unilever intended that Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Class would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

80.     As a result of Unilever's use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

81.     In addition, Unilever's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT II**
**Violation Of Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA")**
**815 ILCS 505/1, *et seq.***
**(On Behalf of Plaintiffs and The Illinois Subclass)**

82.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

83.     Plaintiffs and other Class Members are persons within the context of the ICFA, 815 ILCS 505/1(c).

84.     Unilever is a person within the context of the ICFA, 815 ILCS 505/1(c).

85.     At all times relevant hereto, Unilever was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

86.     Plaintiffs and the proposed Class are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

87.     The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." ICFA, 815 ILCS 505/2.

88.     The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2. Plaintiffs and the other Illinois Subclass Members reasonably relied upon Unilever's representation that the Products were safe for personal use and, due to Unilever's omission, Plaintiffs relied on Unilever's labeling to conclude that the Products were not contaminated with any dangerous substance, including benzene.

89.     Unilever's conduct, as described herein, took place within the State of Illinois and constitute unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

90.     Unilever violated the ICFA by representing that the Products have characteristics or benefits that it does not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

91.     Unilever advertised the Products with intent not to sell it as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

92.     Unilever engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

93.     Unilever engaged in misleading and deceptive advertising that represented that the Products were safe.  Unilever chose to label the Products in this way to impact consumer choices and gain market dominance, as it is aware that all consumers who purchased the Products were exposed to and would be impacted by its omission and would reasonably believe that the Products were safe for personal use and did not contain any dangerous contaminants, including benzene. However, the Products are not safe, as they are contaminated with the carcinogen benzene.

94.     Unilever intended that Plaintiffs and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

95.     Unilever's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

96.     Plaintiffs and Class Members have been damaged as a proximate result of Unilever's violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

97.     As a direct and proximate result of Unilever's violations of the ICFA, as set forth above, Plaintiffs and the Illinois Subclass Members have suffered ascertainable losses of money caused by Unilever's misrepresentations.

98.     Had they been aware of the true nature of the Products, Plaintiffs and Class Members either would have paid less for the Products or would not have purchased them at all.

99.     On January 26, 2022 Plaintiff Morris provided written notice and on March 23, 2022 Plaintiffs Barnes and Dean provided written notice to Unilever of its violations of the ICFA described herein, but Unilever did not remedy its breaches.  Therefore, within 30 days of receiving notice, Unilever did not take the necessary steps outlined in Plaintiffs' notice letter to remedy their breach of the ICFA described herein.

100.    Plaintiffs and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under sections 815 ILCS 505/10a of the ICFA. Plaintiffs and Class Members are also entitled to injunctive relief, seeking an order enjoining Unilever's unfair and/or deceptive acts or practices.

**COUNT III**
**Breach of Express Warranty**
**(On Behalf of the National Class and,**
**alternatively, the Illinois Subclass)**

101.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

102.    Plaintiffs and each member of the Class formed a contract with Unilever at the time Plaintiffs and each member of the Class purchased the Products.

103.    The terms of the contract include the promises and affirmations of fact made by Unilever on the Products' packaging and through marketing and advertising, as described above.

104.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and the members of the Class and Unilever.

105.    As set forth above, Unilever purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Products are safe for their intended use.

106.    Plaintiffs and the members of the Class performed all conditions precedent to Unilever's liability under this contract when they purchased the Products.

107.    Unilever breached express warranties about the Products and their qualities because Unilever's Products contained the harmful chemical benzene at the time of purchase and the Products did not conform to Unilever's affirmations and promises described above.

108.    Plaintiffs and each of the members of the Class would not have purchased the Products had they known the true nature of the harmful chemicals in the Products.

109.    As a result of Unilever's breach of warranty, Plaintiffs and each Class Member suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

110.    On January 26, 2022 Plaintiff Morris provided written notice and on March 23, 2022 Plaintiffs Barnes and Dean provided written notice to Unilever of its breaches of express warranty described herein, but Unilever did not remedy these breaches.  Therefore, within 30 days of receiving notice, Unilever did not take the necessary steps outlined in Plaintiffs' notice letter to remedy their breach of express warranty described herein

**COUNT IV**
**Breach of Implied Warranty**
**(On Behalf of the National Class and,**
**alternatively, the Illinois Subclass)**

111.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

112.    Unilever is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

113.    The Products are considered "goods" under the relevant laws and Unilever knew or had reason to know of the specific use for which the Products, as goods, were purchased.

114.    Unilever entered into agreements with retailers to sell their Products to be used by Plaintiffs and Class Members for personal use.

23

115.    The implied warranty of merchantability included with the sale of each Product means that Unilever guaranteed that the Products would be fit for the ordinary purposes for which antiperspirants are used and sold, and were not otherwise injurious to consumers.  The implied warranty of merchantability is part of the basis for the benefit of the bargain between Unilever, and Plaintiffs and Class Members.

116.    Unilever breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose of providing reasonably reliable and safe use for preventing or masking body odor because the Products contain benzene, a known and dangerous carcinogen. Therefore, the Products are not fit for its particular purpose of safely preventing or masking body odor.

117.    Unilever's warranty expressly applies to the purchaser of the Products, creating privity between Unilever and Plaintiffs and Class Members.

118.    Privity is nonetheless not required because Plaintiffs and Class Members are the intended beneficiaries of Unilever's warranties and its sale through retailers.  Unilever's retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements.  Unilever's warranties were designed for and intended to benefit the consumer only, including Plaintiffs and Class Members.

119.    Unilever has been provided sufficient notice of its breaches of implied warranties associated with the Products.  Unilever was put on constructive notice of its breach through its review of consumer complaints and other reports, including the Valisure testing report described herein, and upon information and belief through its own product testing.

120.    Had Plaintiffs, Class Members, and the consuming public known that the Products were contaminated with benzene, they would not have purchased the Products or would have paid less for them.

121.     As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT V**
**Unjust Enrichment**
**(In the Alternative and on Behalf of the National Class**
**and, alternatively, the Illinois Subclass)**

122.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

123.     Plaintiffs bring this Count in the alternative to Count III.

124.     Plaintiffs and the other members of the Class conferred benefits on Unilever by purchasing the Product.

125.     Unilever has been unjustly enriched in retaining the revenues derived from the purchase of the Products by Plaintiffs and the other members of the Class.

126.     Retention of those monies under these circumstances is unjust and inequitable because Unilever's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs and the other members of the Class because they would have not purchased the Products if Unilever had disclosed that the Products contained harmful chemicals.

127.     Because Unilever's retention of the non-gratuitous benefits conferred on them by Plaintiffs and the other members of the Class is unjust and inequitable, Unilever must pay restitution to Plaintiffs and the other members of the Class for their unjust enrichment, as ordered by the Court.

**COUNT VI**
**Medical Monitoring**
**(On Behalf of the National Class and,**
**alternatively, the Illinois Subclass)**

128.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

129.    As a proximate result of Unilever's acts and omissions, Plaintiffs and Class Members are at a significantly increased risk of developing cancer above the normal base-level risk.

130.    As alleged above, Unilever's Products were contaminated with benzene, a known human carcinogen.

131.    Plaintiffs and Class Members may not develop cancer for many years.

132.    Plaintiffs and Class Members are at a significantly increased risk as they used Unilever's Products for extended periods of time, and as a result were exposed to a contaminant by having their skin absorb the Products.

133.    Based upon the internal and external investigations now made public, Plaintiffs and Class Members are at an increased risk as they were exposed to benzene. Benzene is a hazardous, life-threatening, toxic substance that is known to cause cancer in humans.

134.    Plaintiffs and Class Members are at a significantly increased risk of cancer as they were exposed to Unilever's Products in quantities, and over periods of time sufficient to establish an exposure level that is considered to be hazardous to health, greater than normal background exposure levels, and at levels considered to be sufficient to cause cancer or increase the risk of developing cancer.

135.    The exposure was caused solely and proximately by Unilever's failure to adequately manufacture the Products, Unilever's failure to address discrepancies in batches of the Products during quality control testing, and Unilever's material misrepresentations and other deceptive practices in continuing to claim that the Products were safe for use.

136.    Unilever had a duty to Plaintiffs and Class Members to disclose any defect, contamination, impurity, or other potential health hazard known or discoverable by Unilever, and

26

to ensure that the Products were safe, reliable, and non-hazardous for human use—their intended purpose.

137.    As alleged above, Unilever's own negligent acts and omissions resulted a significantly increased risk of developing cancer for Plaintiffs and Class Members. Cancer is a serious disease-causing life-threatening illness and debilitating cellular, genetic, and physical injury. Technology, analytical tools, tests and/or monitoring procedures exist and are readily available to provide for the testing and early detection of cancer in patients. These technologies, tools, tests and/or monitoring procedures are accepted and widely used by the scientific and medical community. These existing scientific methods include, but are not limited to, guaiac-based fecal occult blood test (gFOBT), fecal immunochemical test (FIT), FIT-DNA test, Flexible Sigmoidoscopy, Colonoscopy, and CT Colonography (Virtual Colonoscopy).  Early detection of cancer in patients is one of the best, and sometimes the only means to treat cancer such that it does not cause lasting, permanent injury, illness, or death.

138.    Early detection of cancer in patients necessarily allows patients to avail themselves of myriad forms of treatment, each of which is capable of altering the course of the illness, such as bringing the cancer into remission, removal of any malignant tumors, and other treatment to alleviate injury.

139.    The tests and treatments for the early detection and treatment of cancer must be prescribed by a qualified physician, and are conducted according to the latest, contemporary, and widely accepted scientific principles. Because benzene-associated cancer screenings may not be conducted with the frequency necessary to identify cancer in the absence of exposure to benzene, the prescribed monitoring regime is different from that normally recommended in the absence of exposure. Plaintiffs and Class Members require more frequent screenings not within the purview of routine medical exams.

140.     The facts alleged above are sufficient or more than sufficient to plead a claim for medical monitoring as a cause of action. Plaintiffs seek, on behalf of themselves and members of the Class, injunctive and monetary relief, including compensatory damages for, and the creation of a fund to adequately finance the costs of, medical monitoring procedures (1) to notify and alert all people exposed to benzene as aforesaid of their exposure and the potential consequences, (2) to provide for necessary testing and screening including but not limited to blood tests, physical examinations, imaging, colonoscopies, endoscopies, and other similar methods for examination, biopsies, pathologic, histologic, and oncologic evaluations, oncologic, histologic, surgical and other necessary medical consultations, (3) to provide for necessary medical and surgical procedures for diagnosis and treatment, (4) to provide for all necessary evaluations and treatment, attorneys' fees, costs, interest, and such further relief as the Court deems equitable and just.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, pray for judgment and relief against Unilever as follows:

a)  For an order declaring: (i) this is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed Classes described herein; and (ii) appointing Plaintiffs to serve as representatives for the Classes and Plaintiffs' counsel to serve as Class Counsel;

b)  For an order enjoining Unilever from continuing to engage in the unlawful conduct set forth herein;

c)  For an order awarding restitution of the monies Unilever wrongfully acquired by its illegal and deceptive conduct;

d)  For an order requiring disgorgement of the monies Unilever wrongfully acquired by its illegal and deceptive conduct;

e)  For compensatory and punitive damages, including actual and statutory damages, arising from Unilever's wrongful conduct and illegal conduct;

f)  For an award of reasonable attorneys' fees and costs and expenses incurred in the course of prosecuting this action; and

g)  For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated: March 25, 2022                    Respectfully submitted,

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**

/s/ Virginia Ann Whitener
Virginia Ann Whitener (6337452)
gwhitener@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.:    (865) 247-0080
Fax:    (865) 522-0049

Nick Suciu III*
nsuciu@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel.:    (313) 303-3472
Fax:    (865) 522-0049

Jennifer Czeisler**
Russell Busch
jczeisler@milberg.com
rbusch@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.:    (865) 247-0080
Fax:    (865) 522-0049

Kevin Laukaitis*
Jonathan Shub*
klaukaitis@shublawyers.com
jshub@shublawyers.com
**SHUB LAW FIRM LLC**

134 Kings Hwy E., 2nd Fl.
Haddonfield, NJ 08033
T: (856) 772-7200
F: (856) 210-9088

Sarah N. Westcot (*Pro Hac Vice*)
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com

Andrew J. Obergfell (*Pro Hac Vice*)
Max S. Roberts*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9189
E-Mail: aobergfell@bursor.com
            mroberts@bursor.com

David C. Magagna Jr. (*Pro Hac Vice*)
Charles E. Schaffer*
**LEVIN, SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
cschaffer@lfsblaw.com
dmagagna@lfsblaw.com


*Admitted to the General Bar
***Pro Hac Vice* Application Forthcoming

***Attorneys for Plaintiffs and the Proposed
Classes***