**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| YVONNE BARNES, PATRICIA DEAN, ANTONIO MORRIS, and BERNADETTE BOGDANOVS, individually and on behalf of all others similarly situated, | Case No.: 1:21-cv-06191 |
| | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| UNILEVER UNITED STATES INC., | |
| Defendant. | |

Plaintiffs Yvonne Barnes, Patricia Dean, Antonio Morris, and Bernadette Bogdanovs ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, bring this class action complaint against Defendant Unilever United States, Inc. ("Defendant" or "Unilever") and allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of Suave 24-hour Protection Powder aerosol antiperspirant and Suave 24-hour Protection Fresh aerosol antiperspirant products ("Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      The presence of benzene in the Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

3.      Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Products

contained benzene, but Defendant misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by not including benzene on the Products' labels or otherwise warning about its presence.

4. Plaintiffs and Class members reasonably relied on Defendant's representations that the Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

5. Plaintiffs and Class members purchased and used the Products and were therefore exposed to or risked being exposed to the harmful presence of benzene in the Products.

6. The Products are worthless because they contain or risked containing benzene, a known human carcinogen that is an avoidable ingredient in the Products and their manufacturing process. Indeed, the presence of benzene renders the Products adulterated, misbranded, and illegal to sell.

7. Defendant is therefore liable to Plaintiffs and Class members for selling the Products without disclosing that the Products contain or risk containing benzene.

**PARTIES**

### I. Plaintiffs

8. Plaintiff Yvonne Barnes is a resident and citizen of Chicago, Illinois. Plaintiff Barnes purchased Suave 24-Hour Protection Powder aerosol antiperspirant regularly for several years, approximately every two to three weeks. The last time Plaintiff Barnes purchased the Product was in or around the end of October 2021. Plaintiff Barnes purchased the Product at Walmart, Target, CVS, and Walgreens stores located in Chicago, Illinois and Oak Park, Illinois.

9. Plaintiff Patricia Dean is a resident and citizen of Homewood, Illinois. Plaintiff Dean purchased Suave 24-Hour Protection Powder aerosol antiperspirant regularly for the last five years, approximately three to four times each year. Plaintiff Dean most recently purchased the

Product in or around May or June 2021. Each time Plaintiff Dean purchased the Product, she did so at the Walmart in Homewood, Illinois.

10.     Plaintiff Antonio Morris is a resident and citizen of Chicago, Illinois. Plaintiff Morris purchased Suave 24-Hour Protection Fresh aerosol antiperspirant regularly for several years, approximately four times a year. The last time Plaintiff Morris purchased the Product was in or around January 2022. Plaintiff Morris purchased the Product at Walgreens stores located in Chicago, Illinois.

11.     Plaintiff Bernadette Bogdanovs is a resident and citizen of Palm Desert, California. Plaintiff Bogdanovs purchased Suave 24-Hour Protection Powder aerosol antiperspirant in or around January 2022. Plaintiff Bogdanovs purchased the Product at a Big Lots store located in Cathedral City, California.

12.     When purchasing the Products, Plaintiffs reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Products were properly manufactured, free from defects, and safe for their intended use. Plaintiffs relied on these representations and warranties when deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the Products containing or risking containing benzene, Plaintiffs would not have been willing to purchase the Products. The Products Plaintiffs purchased were worthless because they either contained or risked containing the known carcinogen benzene. Accordingly, Plaintiffs were injured in fact and lost money as a result of Defendant's improper conduct.

## II. Defendant

13.     Defendant Unilever United States, Inc. is a Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey. Defendant sells Suave brand antiperspirant aerosol and spray products throughout the United States. These Products, including those purchased by Plaintiffs and Class members, are available at various retail stores throughout the United States. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Products.

14.     Defendant Unilever United States, Inc. is part of an international consumer goods company, the Unilever Group, which consists of two parent companies, Unilever NV and Unilever PLC, together with group subsidiaries, and operates as a single economic entity.

15.     Unilever NV is a public limited company registered in the Netherlands, which has listings of shares and depositary receipts for shares on Euronext Amsterdam and of New York Registry Shares on the New York Stock Exchange.

16.     Unilever PLC is a public limited company registered in England and Wales which has shares listed on the London Stock Exchange and, as American Depositary Receipts, on the New York Stock Exchange.

17.     The Unilever Group has company headquarters in Rotterdam, Netherlands, London, England, and the United States. The Unilever Group operates in the United States under its subsidiary Unilever United States, Inc.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

19.     This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise out of Defendant's contacts with this district. Defendant has consented to personal jurisdiction in this district with respect to Plaintiffs Harris and Van der Steeg's individual claims.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state. Defendant has consented to venue in this district with respect to Plaintiffs Harris and Van der Steeg's individual claims.

## FACTUAL ALLEGATIONS

### I. Unilever's History in the Industry

21.     Unilever is a large multinational consumer goods company known for its wide range of personal care and hygiene products, including the antiperspirant Products at issue here.

22.     Unilever owns over 400 brands, and its products are available in 190 countries.

23.     Unilever's products, including its Suave product line, are manufactured, distributed, and sold throughout the United States, including the State of Illinois.

24.    Unilever gained consumers' trust over the last 130 years, and, according to the company, 2.5 billion people use its products each day.[1]

25.    Unilever achieved worldwide sales of approximately $62 billion in 2020, which 42% was specifically derived from personal care products.[2]

26.    Unilever markets and sells aerosol deodorant and antiperspirant as part of its Suave product line. Unilever has sold Suave personal care products for the last 75 years, and, according to Unilever, "the brand has provided high-quality, value products that work as well as premium brands."[3]

## II.   Benzene Is a Known Human Carcinogen

27.    The World Health Organization and the International Agency for Research on Cancer have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[4]

28.    The Department of Health and Human Services has determined that benzene causes cancer in humans.[5]

29.    "IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene

---

[1] *2020 Full Year Results*, Unilever Feb. 4, 2021), https://www.unilever.com/Images/ir-q4-2020-full-announcement_tcm244-558959_en.pdf
[2] *Id*.
[3] *Suave*, Unilever, https://www.unileverusa.com/brands/beauty-personal-care/suave/ (last visited Aug. 17, 2022).
[4] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/list-of-classifications (last updated July 1, 2022).
[5] *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma."[6]

30.     Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[7]

31.     The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[8]

32.     The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[9]

### III.   Benzene Is Primarily Used in Industrial Processes and Is Highly Regulated

33.     The CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[10]

34.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[11]

---

[6] *Benzene and Cancer Risk*, American Cancer Society (last updated Jan. 5, 2016) https://www.cancer.org/cancer/cancer-causes/benzene.html.
[7] *Id.*
[8] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last updated Oct. 30, 2019).
[9] *Facts About Benzene*, *supra.*
[10] *Id.*
[11] *Benzene*, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last updated Jan. 14, 2019).

35. The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[12]

36. Where the use of benzene or other Class 1 solvents is unavoidable, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 parts per million ("ppm").[13]

## IV. Exposure to Benzene in any Amount Is Extremely Dangerous

37. A 1939 study on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe."[14]

38. A 2010 study summarized the epidemiological studies of the carcinogenic effects of benzene exposure and provided an overview of the hematotoxic effects of benzene.[15] The study concluded:

   a. There is probably *no safe level* of exposure to benzene, and *all exposures* constitute some risk in a linear, if not supralinear, and additive fashion.

   b. Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

   c. Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

---

[12] David Light et al., *Valisure Citizen Petition on Benzene in Body Spray Products* (Nov. 3, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf (the "*Valisure Citizen Petition*").

[13] *Id.*

[14] F.T. Hunter, *Chronic Exposure to Benzene (Benzol): The Clinical Effects*, 21 J. Indus. Hygiene & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388.

[15] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 Ann. Rev. Pub. Health 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

39. The CDC has stated that ways in which people "could be exposed to benzene" include[16]:

    a. Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

    b. Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

    c. The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

    d. Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

    e. People working in industries that make or use benzene may be exposed to the highest levels of it.

    f. A major source of benzene exposure is tobacco smoke.

40. The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[17]

41. "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[18]

42. Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

43. Benzene exposure from body sprays is especially troubling because the spray is directly onto the skin, with the remnants flying through the air likely to be at least partially inhaled

---

[16] *Facts About Benzene*, *supra*.
[17] *NIOSH Pocket Guide*, *supra*.
[18] *Facts About Benzene*, *supra*.

by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

44.     The FDA allows for up to 2 parts per million of benzene in products where the use of benzene is "unavoidable." However, the "FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product."[19] Thus, the use of benzene is not unavoidable in drug products, including the Products at issue here.

## V. Discovery of Benzene in the Products

45.     Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products containing said harmful chemicals from reaching consumers. Valisure, an "independent laboratory"[20], is a company with a core mission "to help ensure the safety, quality and consistency of medications and supplements in the market."[21]

46.     In terms of accreditation and registration, "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238),"[22] and it is registered with the Drug Enforcement Administration (License # RV0484814) and FDA (FEI #: 3012063246)."[23]

47.     Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine in ranitidine and metformin and benzene in hand sanitizers and

---

[19] *Valisure Citizens' Petition*, at 4.
[20] "About Us." https://www.valisure.com/about (last visited Aug. 18, 2022).
[21] *Valisure Citizen Petition*, *supra*.
[22] *Id.*
[23] *Id.*

sun care products. Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by the industry and led to recalls by manufacturers over the subject products.

48.     On November 3, 2021, Valisure tested for benzene in various types of antiperspirants utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation.[24]

49.     GC-MS "is generally considered one of the most accurate analyses available."[25] Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[26]

50.     "The GC-MS method described in this petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[27]

51.     Valisure analyzed 108 unique batches from thirty brands of deodorant and antiperspirant aerosol products.[28]

52.     Valisure "detected high levels of benzene and other contaminants in specific batches of body spray products, some of which contain active pharmaceutical ingredients aluminum chlorohydrate or aluminum sesquichlorohydrate."[29]

---

[24] *Id.*
[25] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (last visited July 20, 2022).
[26] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.
[27] *Valisure Citizen Petition*, *supra*.
[28] *Id.*
[29] *Id.*

53.     Valisure identified twenty-four body spray products or product line batches which contained levels of benzene at 2 ppm or higher, including the Products.[30]

54.     Valisure's testing results were confirmed by recalls of antiperspirant products by Procter & Gamble, Helen of Troy, and even Defendant here.

55.     Valisure specifically measured benzene concentrations from 0.97 to 5.21 ppm in the Products:[31]

| Brand | UPC | Lot | Expiration | Description | Average ppm |
|-------|-----|-----|------------|-------------|-------------|
| Suave | 079400751508 | 07151AD14 | 07/2023 | 24 Hour Protection, Powder, Aerosol | 5.21 |
| Suave | 079400785503 | 08091AD00 | 08/2023 | 24 Hour Protection, Powder, Aerosol | 2.30 |
| Suave | 079400785503 | 08091AD02 | 08/2023 | 24 Hour Protection, Powder, Aerosol | 2.24 |
| Suave | 079400784902 | 08141AD00 | 08/2023 | 24 Hour Protection, Powder, Aerosol | 0.97 |

---

[30] *Id.*
[31] *Id.*

56.     In most of the lots tested, the detected levels of benzene in the Products are greater than the 2 ppm concentration limit for "unavoidable" uses per FDA guidance.[32]  However, because benzene is not a requisite component of manufacturing or packaging body sprays, its presence in the Products is not unavoidable and "any significant detection of benzene should be deemed unacceptable."[33]

57.     David Light, Founder and Chief Executive Officer of Valisure, stated that "[t]he presence of this known human carcinogen in body spray products regularly used by adults and adolescents in large volumes makes this finding especially troubling."[34]

58.     The Products are not designed to contain benzene, and no amount of benzene is acceptable in antiperspirant sprays such as the Products manufactured, distributed, and sold by Defendant. Further, although Defendant lists both active and inactive ingredients on the Products' labels, Defendant failed to disclosure on the Products' labeling or anywhere in Defendant's marketing that the Products contain benzene.

59.     Upon information and belief, Defendant has, contrary to FDA guidance, never conducted a "risk benefit assessment" regarding the use of benzene as a residual solvent in its Products, much less "strongly justified" its use before the FDA.[35] Nor is the use of benzene as a residual solvent in manufacturing aerosol antiperspirant products "supported by the safety data" in light of the known health risks associated with exposure to benzene as detailed herein.[36]

---

[32] *Id.*
[33] *Id*.
[34] *Id*.
[35] *Guidance for Industry – Q3C Impurities: Residual Solvents*. 1997. Accessed from: https://www.fda.gov/media/71736/download at p. 2.
[36] *Id.*

13

60.     Defendant eventually issued a voluntary recall of the Products.[37]     However, Defendant's recall was inadequate for numerous reasons.   Namely, Defendant discontinued the Suave line for "business reasons" in October 2021, but did not initiate the recall until March 2022, *five months* after Defendant ceased selling the Products.   Further, Defendant has required proof of purchase for consumers to procure any payment from the recall.   Thus, in order to make use of the recall, consumers would have had to retain a carcinogenic, disposable product for at least five months to make use of Unilever's recall.   And even then, Unilever often offers coupons for replacement products as opposed to full refunds for purchasers.   Finally, Unilever is only offering any sort of remedy for a specific lot of the Product, not all lots.   Thus, Unilever's recall is in no way adequate.

61.     In its recall announcement, however, Defendant does not disclose how many products it tested or what levels of benzene were detected in those products. The failure to disclose such information is concerning, since there is "no safe level of benzene" exposure.

## VI.  Benzene Renders the Products Adulterated, Misbranded, and Illegal to Sell

62.     "Antiperspirant body spray products are considered over-the-counter drugs and certain deodorant body sprays are considered cosmetics that are regulated by the U.S. Food and Drug Administration."[38]

---

[37] *Unilever Issues Voluntary Nationwide Recall of Suave 24-Hour Protection Aerosol Antiperspirant Powder and Suave 24-Hour Protection Aerosol Antiperspirant Fresh Due to Presence of Slightly Elevated Levels of Benzene*, FDA (Mar. 30, 2022), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-nationwide-recall-suave-24-hour-protection-aerosol-antiperspirant-powder.
[38] *Valisure Citizen Petition*, *supra*.

63.     The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of all antiperspirant and deodorant products, including safety data on its ingredients.[39]

64.     As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state law analogues. These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

65.     The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a). In other words, manufacturers, like Unilever, at all phases of the design, manufacture, and distribution chain are bound by these requirements.

66.     The cGMPs set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

---

[39] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).

67. Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

68. FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

69. A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

70. "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

71. FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[40]

72. Regardless, "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their

---

[40] *Valisure Citizen Petition*, *supra*.

manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[41]

73.     Regardless, Defendant's Products contain levels of benzene above 2 ppm.[42]

74.     Defendant could have avoided any potential for benzene contamination in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with absolutely no benzene in them.

75.     The mere presence of benzene—which, upon information and belief, resulted from Defendant's failure to comply with cGMPs—renders the Products both adulterated and misbranded under the FDCA. The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

76.     The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 352(a)(1).

77.     A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

78.     The FDCA provides that "a cosmetic shall be deemed to be misbranded- if its labeling is false or misleading in any particular." 21. U.S.C. § 362(a).

---

[41] *Id.*
[42] *Id.*

79.     The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/14 is exactly the same as the FD&C Act.

80.     Similarly, in California, the Sherman Law states that "any cosmetic is misbranded if its labeling is false or misleading in any particular." Cal. Health & Saf. Code, § 111730.

81.     As alleged herein, Defendant has violated the FDCA, the IL FDCA, the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), California's Consumer Legal Remedies Act ("CLRA"), California's Unfair Competition Law ("UCL"), California's False Advertising Law ("FAL"), and consumer protection statutes.  Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding benzene contamination affecting the Products.

82.     If Defendant had disclosed to Plaintiffs and putative Class Members that the Products contained or risked containing benzene and thus risked users to benzene exposure, Plaintiffs and putative Class Members would not have purchased the Products or they would have paid less for the Products.

83.     As a seller of an OTC drug product, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before the Products injecting into the stream of commerce for consumers to use on their bodies. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene or other impurities. Nor did it disclose to Plaintiffs in any advertising or marketing that its antiperspirant products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products were of

merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

## VII. Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiffs and Reasonable Consumers

84.     The Products contain butane as a propellant, which Valisure identified as a potential source of contamination of benzene.

85.     Aerosols contain volatile hydrocarbons, like butane or isobutane, as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

86.     Because the chemicals are derived from the same sources in the same facilities, there is high potential for benzene contamination in the processing of butane.

87.     Manufacturing companies that work with butane understand the risks of benzene contamination.[43]

88.     Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as butane, knew or should have known of the risks of benzene contamination.

89.     Defendant's use of butane as a propellant therefore put them on notice of the risk of benzene contamination in the Products.

90.     Defendant sold dry spray antiperspirant products containing butane during the class period despite Defendant's knowledge of the risk of benzene contamination.

---

[43] *See, e.g.*, *Butane Safety Data Sheet*, Whiting, https://whiting.com/wp-content/uploads/Butane-SDS.pdf (last updated Oct. 30, 2013) ("MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS.").

91.     Federal and state regulatory regimes require that labeling for OTC products identify each active and inactive ingredient.[44]

92.     An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect." 21 C.F.R. 201.66(b)(2).

93.     Benzene is not listed on the Products' labels as either an active or inactive ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.

94.     Defendant has engaged in deceptive, untrue, and misleading advertising by making representations regarding the safety of the Products, including assuring consumers that:

    a.   "[t]o keep people safe, we conduct two types of consumer safety risk assessment: ingredient safety and microbiological safety. Ingredient safety assessments evaluate the potential effects an ingredient in our products could have on the body;"[45]

    b.   "[t]he safety of our products is our top priority. That is why each new product innovation is evaluated systematically and scientifically by our team in the Safety and Environmental Assurance Centre (SEAC). Our scientists consider any safety risks to the consumers who use our products, to the workers who make them, and to the environment to ensure all our products are safe to use;"[46]

---

[44] *Guidance for Industry National Uniformity for Nonprescription Drugs — Ingredient Listing for OTC Drugs*, FDA (Apr. 1998), https://www.fda.gov/media/72250/download.

[45] *Keeping people and the environment safe*, Unilever, https://www.unilever.com/planet-and-society/safety-and-environment/keeping-people-and-the-environment-safe/ (last visited Aug. 17, 2022).

[46] *Id.*

    c.   "Before making our products available to consumers, we make health and safety our top priority;"[47]

    d.   "All Suave formulas are safe to use and meet the highest global standards in safety and quality";[48]

    e.   "We rigorously assess all Suave products to ensure all ingredients, manufacturing and labeling comply with applicable laws and regulations all over the world";[49]

    f.   "testing [is] done to ensure that consumers will get a quality product that is safe and stable for use under different temperature and humidity conditions";[50]

    g.   "safety assessments . . . [are conducted to] make sure that we only use what is needed to provide safe and effective products";[51]

    h.   "regulatory assessment [is conducted to] ensure[] that our products, their ingredients, how they are manufactured and labeled comply with all federal and state laws";[52] and

    i.   "we focus on one thing. Creating quality products"[53]

    95.    Defendant made all of these assurances regarding the safety and quality of its Products without disclosing to consumers that its Products contain elevated levels of a cancer-causing chemical (benzene). This is misleading to consumers. Moreover, Plaintiff and the putative Class members were exposed to one or more of these representations during the class period and relied on one or more of these representations in deciding to purchase Defendant's Products. Additionally, although the Products were found to contain benzene, Defendant does not list benzene among the active or inactive ingredients anywhere on its website, and nothing on the

---

[47] *Trust in Suave*, Suave, https://www.suave.com/us/en/dmdm-hydantoin-products-information.html (Aug. 18, 2022).

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *About*, Suave, https://www.suave.com/us/en/about.html (Aug. 18, 2022).

Products' labels otherwise insinuate, state, or warn that the Products contain benzene. Again, such misrepresentations mislead consumers regarding the safety and quality of the Products.

96.     With respect to benzene in particular, Defendant recently added a section to its website (after this lawsuit was filed) titled "Controlling for Benzene," which states:

> Benzene is not an ingredient that we add to our products. Any benzene detected in the final product usually occurs because of its natural presence in certain raw materials. We have strict quality controls in place that limit the presence of benzene in our deodorant, skincare and haircare products and require that any traces found fall within defined safety levels. All of our products are rigorously assessed by our safety scientists and meet the highest global standards in quality and safety as well as applicable laws and regulations, so that you can have complete trust in Suave.[54]

97.     Defendant's subsequent "internal review" of the Products confirmed Valisure's findings insofar as its review revealed "unexpected" "elevated levels of benzene" in its Products, necessitating a voluntary recall.

98.     Thus, contrary to its claims, Defendant does not have "strict quality controls in place that . . . require that any traces found fall within defined safety levels."[55] If that were true, Valisure would not have detected benzene in Suave Antiperspirants that far exceeded any supposed FDA limit, and Defendant would not have confirmed Valisure's findings by detecting "elevated levels of benzene" warranting a product recall.

99.     As such, Defendant's advertising campaigns are false and misleading. The presence of benzene in the Products renders the Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiffs would not have purchased the Products had they been truthfully and accurately labeled.

---

[54] https://www.suave.com/us/en/dmdm-hydantoin-products-information.html.
[55] *Id*.

100.    If Defendant had not routinely disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendant would have identified the presence of the benzene contaminant through routine and required testing.

101.    Further, had Defendant adequately tested its Products for benzene and other carcinogens and impurities, it would have discovered that its Products contained benzene – even at levels above the FDA's limit (to the extent even applicable), making those Products illegal to distribute, market, and sell.

102.    Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[56]

103.    Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced contaminated, adulterated, and misbranded Products containing or risked containing dangerous amounts of benzene into the U.S. market.

104.    By marketing and selling its body spray products in the stream of commerce with the intent that its Products would be purchased by Plaintiffs and Class Members, Defendant warrants that the Products are safe to use rather than adulterated body sprays containing a dangerous, cancer-causing chemical.

105.    Defendant did not disclose the actual or potential presence of benzene in its antiperspirant products on the Products' labeling, advertising, marketing, or sale of the Products.

106.    Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers

---

[56] https://monographs.iarc.who.int/list-of-classifications (last visited Aug. 18, 2022).

such as Plaintiffs and Class members make purchasing decisions based on the representations made on the Products' labeling, including the ingredients listed.

107.    Defendant knows that if it had not omitted that the Products contained benzene, then Plaintiffs and Class members would not have purchased the Products.

## VIII.  Injuries to Plaintiffs and Class Members

108.    When Plaintiffs purchased Defendant's Products, Plaintiffs did not know, and had no reason to know, that Defendant's Products contained or risked containing the harmful carcinogen benzene. Not only would Plaintiffs not have purchased Defendant's Products had they known the Products contained benzene, but they would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens and impurities.

109.    Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to truthfully and honestly report what the Products contain on the Products' packaging or labels.

110.    Further, given Unilever's position in the health and beauty market as an industry leader, Plaintiffs and reasonable consumers, trusted and relied on Unilever's representations and omissions regarding the presence of benzene in the Products.

111.    Yet, when consumers look at the Products' packaging, there is no mention of benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products. This leads reasonable consumers to believe the Products do not contain benzene. Indeed, these expectations are reasonable because if the Products are manufactured properly, benzene will not be present in the Products.

112.    No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendant's Products).

113.    Thus, if Plaintiffs and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

114.    Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the Product are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class Members.

115.    Plaintiffs and Class members bargained for an antiperspirant product free of contaminants and dangerous substances. Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene—or at risk of containing the same—and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

116.    As alleged above, Plaintiffs and Class members' Products either contained benzene or were at significant risk of containing the same.

117.    Plaintiffs and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## **CLASS ALLEGATIONS**

118.    Plaintiffs, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

119.    Plaintiffs seek to represent a class defined as:

All persons who purchased one or more of Defendant's Products in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

120.    Plaintiffs also seek to represent a subclass defined as:

All persons who purchased one or more of Defendant's Products in Illinois for personal or household use within any applicable limitations period ("Illinois Subclass").

121.    Plaintiffs also seek to represent a subclass defined as:

All persons who purchased one or more of Defendant's Products in California for personal or household use within any applicable limitations period ("California Subclass").

122.    Plaintiffs also seek to represent a subclass defined as:

All persons who purchased one or more of Defendant's Products in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington for personal or household use within any applicable limitations period ("Consumer Fraud Multi-State Subclass").[57]

123.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Products.

---

[57] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

124.     Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

125.     *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

126.     *Commonality*: Questions of law or fact common to the Class include, without limitation:

    a.  Whether the Products contain benzene;

    b.  Whether a reasonable consumer would consider the presence of benzene in the Products to be material;

    c.  Whether Defendant knew or should have known that the Products contain benzene;

    d.  Whether Defendant misrepresented whether the Products contain benzene;

    e.  Whether Defendant failed to disclose that the Products contain benzene;

    f.  Whether Defendant concealed that the Products contain benzene;

    g.  Whether Defendant engaged in unfair or deceptive trade practices;

    h.  Whether Defendant violated the state consumer protection statutes alleged herein;

    i.  Whether Defendant was unjustly enriched; and

    j.  Whether Plaintiffs and Class members are entitled to damages.

127.     *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

128.     *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in

the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

129. *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

130. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF STATE CONSUMER FRAUD ACTS
**(On behalf of Plaintiffs and the Consumer Fraud Multi-State Subclass)**

131. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

132. Plaintiffs bring this Count on behalf of themselves and the Consumer Fraud Multi-State Subclass against Defendant, Unilever.

133. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

134. Plaintiffs and the other Members of the Consumer Fraud Multi-State Subclass have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiffs and Members of the Consumer Fraud Multi-State Subclass have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

135. Defendant engaged in unfair and/or deceptive conduct, including, but not limited to, making implied disease claims in violation of the FDCA.

136. Defendant also engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the presence of benzene in the Products, as discussed herein.

137. Defendant intended that Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Subclass would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

138. Given Defendant's position in the health and beauty market as an industry leader, Plaintiffs and reasonable consumers, trusted and relied on Unilever's representations and omissions regarding the presence of benzene in the Products.

139. As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Subclass have sustained damages in an amount to be proven at trial.

140.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT II**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE TRADE PRACTICES ACT**
**815 ILCS 505/1, *et seq.***
**(On behalf of Plaintiffs Barnes, Dean, and Morris and the Illinois Subclass)**

141.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142.    Plaintiffs Barnes, Dean, and Morris bring this Count on behalf of themselves and the Illinois Subclass against Defendant, Unilever.

143.    Plaintiffs and other Class Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

144.    Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

145.    At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

146.    Plaintiffs and the proposed Class are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

147.    The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

148.    The FDCA prohibits introduction into interstate commerce "of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

149.    As the Products are adulterated and misbranded, the FDCA specifically prohibits their introduction into interstate commerce, and thus, actions under the ICFA related to the Products being adulterated and misbranded are not barred by 815 ILCS 505/10b(1).

150. The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." ICFA, 815 ILCS 505/2.

151. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

152. Plaintiffs and the other Illinois Subclass Members reasonably relied upon Defendant's representation that the Products were safe for personal use and, due to Defendant's omission of the presence of benzene in the Products, Plaintiffs read and relied on Defendant's labeling to conclude that the Products were not contaminated with any dangerous substance, including benzene.

153. Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

154. Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

155. Defendant advertised the Products with intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

156. Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

157.    Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Products contained benzene, but Defendant not only failed to properly test and quality-check placeits Products, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by not including benzene or the risk of benzene contamination on the Products' labels or otherwise warning about its presence.

158.    Defendant intended that Plaintiffs and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

159.    Given Defendant's position in the health and beauty market as an industry leader, Plaintiffs and reasonable consumers, trusted and relied on Unilever's representations and omissions regarding the presence of benzene in the Products.

160.    Defendant's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

161.    Plaintiffs and Class Members have been damaged as a proximate result of Defendant's violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

162.    As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiffs and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's misrepresentations and material omissions regarding the presence of benzene in the Products.

163.   Had they been aware of the true nature of the Products, Plaintiffs and Class Members either would have paid less for the Products or would not have purchased them at all.

164.   On January 26, 2022, Plaintiff Morris provided written notice and on March 23, 2022, Plaintiffs Barnes and Dean provided written notice to Defendant of its violations of the ICFA described herein, but Defendant did not remedy its breaches. Therefore, within 30 days of receiving notice, Defendant did not take the necessary steps outlined in Plaintiffs' notice letter to remedy their breach of the ICFA described herein.

165.   Based on Defendant's unfair and/or deceptive acts or practices, Plaintiffs and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under 815 ILCS 505/10a.

### COUNT III
### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (On behalf of Plaintiff Bogdanovs and the California Subclass)

166.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.   Plaintiff Bogdanovs brings this Count on behalf of herself and the California Subclass against Defendant, Unilever.

168.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200.

### *Fraudulent Acts and Practices*

169.   Any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice under the UCL. Similarly, any advertising that is deceptive, untrue or misleading constitutes a fraudulent business act or practice under the UCL.

170.    Defendant has engaged in conduct that is likely to deceive members of the public. This conduct includes representing on its Products' labels that its Products contain only the ingredients listed in the labels, which is untrue, and failing to make any mention that the Products are adulterated with benzene, a known human carcinogen.

171.    As alleged above, Defendant has engaged in deceptive, untrue, and misleading advertising by making representations regarding the safety of the Products and material omissions regarding the presence of benzene in the Products.

172.    Plaintiff and the putative Class members were exposed to one or more of these representations and/or omissions during the class period and relied on one or more of these representations and/or omissions in deciding to purchase Defendant's Products. Indeed, although the Products were found to contain benzene, Defendant does not list benzene among the active or inactive ingredients anywhere on its website, and nothing on the Products' labels otherwise insinuate, state, or warn that the Products contain benzene. Again, such misrepresentations and omissions mislead consumers regarding the safety and quality of the Products.

173.    Contrary to its claims, Defendant does not have "strict quality controls in place that . . . require that any traces found fall within defined safety levels." If that were true, Valisure would not have detected benzene in Suave Antiperspirants that far exceeded any supposed FDA limit, and Defendant would not have confirmed Valisure's findings by detecting "elevated levels of benzene" warranting a Product recall.

174.    By committing the acts alleged above, Defendant has engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

***Unlawful Acts and Practices***

175.    The violation of any law constitutes an unlawful business practice under Business & Professions Code §17200.

176.    Defendant's conduct also violates Cal. Health & Safety Code § 111730, which prohibits the sale of any misbranded product. By selling Products that do not disclose the presence of benzene in its labeling or otherwise, the labeling is "false and misleading in any particular" in violation of Health & Safety Code § 111730.

177.    By violating the FDCA and/or Cal. Health and Safety Code § 111730, Defendant has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200.

### *Unfair Acts and Practices*

178.    Any business practice that offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers constitutes an "unfair" practice under the UCL.

179.    Defendant has engaged in unfair business practices. This conduct includes representing that the Products are safe and omitting the material fact that the Products contain admittedly "elevated" levels of benzene, a cancer-causing chemical.

180.    Defendant has engaged in conduct that violates the legislatively declared policies of the FTC Act against committing unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. Defendant gained an unfair advantage over its competitors, whose advertising for products must comply with the FTC Act.

181.    Defendant's conduct, including misrepresenting the safety and efficacy of the Products, is substantially injurious to consumers. Plaintiff and the Class would not have paid for Suave Antiperspirants adulterated with benzene but for Defendant's false labeling, advertising,

and promotion. Thus, Plaintiff and the putative Class have "lost money or property" as required for UCL standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

182. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representation of the ingredients contained in the Products' labels and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

183. By committing the acts described above, Defendant has engaged in unfair business acts and practices which constitute unfair competition within the meaning of the UCL.

184. As a result of the conduct described above, Defendant has been unjustly enriched at the expense of the Plaintiff and the putative Class.

185. An action for restitution is specifically authorized under Cal. Bus. & Prof. Code 17203.

186. Wherefore, Plaintiff prays for judgment against Defendant, as set forth hereafter. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of the Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

187. On behalf of Plaintiff and the putative Class, Plaintiff seeks an order for the restitution of all monies spent on the Products, which were acquired through acts of fraudulent, unfair, or unlawful competition. In addition, because the Products admittedly contain elevated levels of benzene, the measure of restitution should be rescission and full refund insofar as the Suave Antiperspirants are worthless. But for Defendant's misrepresentations and omissions,

Plaintiff would have paid nothing for Products that contain elevated levels of a known human carcinogen. Indeed, there is no discernible "market" for an OTC antiperspirant that is adulterated with elevated a known human carcinogen. As recognized by the World Health Organization, "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended." As a result, the Products are rendered valueless.

188.    Plaintiff Bogdanovs and California Subclass Members have no adequate remedy at law for this claim.  Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

189.    Alternatively, legal remedies available to Plaintiff Bogdanovs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

190.    Furthermore:

a.    To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff Bogdanovs fails to sufficiently adduce evidence to support an award of damages.

b.    Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds

taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

c. Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements. Further, the "unlawful" prong of the UCL is the only way for Plaintiff Bogdanovs to vindicate violations of the Sherman Act because the Sherman Act contains no private right of action.

d. A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." Restatement (Third) Of Restitution § 4(2).

### <u>COUNT IV</u>
### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code § 17500, *et seq.*
### (On behalf of Plaintiff Bogdanovs and the California Subclass)

191. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

192. Plaintiff Bogdanovs brings this Count on behalf of herself and the California Subclass against Defendant, Unilever.

193. California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

194. As set forth herein, Defendant's marketing claims that its Products are "safe to use and meet the highest global standards in safety and quality" are untrue and misleading. To the contrary, antiperspirants that contain elevated levels of benzene present a real health risk to consumers.

195. Defendant knew, or reasonably should have known, that its claims regarding the safety and quality of its Products and/or omissions regarding the presence of benzene in the Products were untrue or misleading.

196. Plaintiff and members of the California Subclass are entitled to monetary relief, and restitution in the amount they spent on the Products.

197.    Plaintiff Bogdanovs and California Subclass Members have no adequate remedy at law for this claim.  Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

198.    Alternatively, legal remedies available to Plaintiff Bogdanovs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

199.    Furthermore:

a.    To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff Bogdanovs fails to sufficiently adduce evidence to support an award of damages.

b.    Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

c.    Legal claims for damages are not equally certain as restitution because claims under the FAL entail few elements.

d.    A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law."  Restatement (Third) Of Restitution § 4(2).

## COUNT V
## VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Bus. & Prof. Code § 1750, *et seq.*
### (On behalf of Plaintiff Bogdanovs and the California Subclass)

200.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201.     Plaintiff Bogdanovs brings this Count on behalf of herself and the California Subclass against Defendant, Unilever.

202.     Defendant has employed or committed methods, acts, or practices declared unlawful by Cal. Civ. Code §1770 in connection with the Products.

203.     In particular, by failing to inform consumers that the Products contain benzene, Defendant has violated the following provisions under California Civil Code § 1770(a):

> (5) by representing that the Products have characteristics, uses and/or benefits which they do not;

> (7) by representing that the Products were of a particular standard, quality, or grade which they are not;

> (9) by advertising the Products with intent not to sell them as advertised; and

> (16) by representing that the Products have been supplied in accordance with previous representations when they have not.

204.     Plaintiff and the putative Class are not presently seeking monetary damages under the CLRA. Plaintiff reserves the right to request amendment of this complaint to include a request for damages under the CLRA after complying with Civil Code 1782(a).

205.     Plaintiff Bogdanovs and California Subclass Members have no adequate remedy at law for this claim.  Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

206.    Alternatively, legal remedies available to Plaintiff Bogdanovs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

207.    Furthermore:

a.  To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff Bogdanovs fails to sufficiently adduce evidence to support an award of damages.

b.  Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

c.  Legal claims for damages are not equally certain as restitution because claims under the CLRA entail few elements.

d.  A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law."  RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

## COUNT VI
## UNJUST ENRICHMENT
### (On behalf of Plaintiffs and the Nationwide Class)

208.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class against Defendant, Unilever.

210. This claim is brought under the laws of the States of California and Illinois.

211. Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

212. Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

213. Plaintiffs and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

214. Defendant knowingly received and enjoyed the benefits conferred on it by Plaintiffs and Class members.

215. It is inequitable for Defendant to retain the benefits conferred by Plaintiffs and Class members' overpayments.

216. Plaintiffs and Class members seek establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for relief and judgment against Defendant as follows:

      a. Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class and Subclasses, and designating Plaintiffs' counsel as Class Counsel;

b. Awarding Plaintiffs and Class members compensatory damages, in an amount to be determined at trial;

c. Awarding Plaintiffs and Class members appropriate relief, including but not limited to actual damages;

d. For restitution and disgorgement of profits;

e. Awarding Plaintiffs and Class members reasonable attorneys' fees and costs as allowable by law;

f. Awarding pre-judgment and post-judgment interest;

g. For punitive damages; and

h. Granting any other relief as this Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: August 24, 2022

Respectfully submitted,

*/s/ Virginia Ann Whitener*
Virginia Ann Whitener (6337452)
Jennifer Czeisler**
Russell Busch
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.:(865) 247-0080
Fax:(865) 522-0049
gwhitener@milberg.com
jczeisler@milberg.com
rbusch@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel.:(313) 303-3472
Fax:(865) 522-0049
nsuciu@milberg.com

43

Kevin Laukaitis
Jonathan Shub
**SHUB LAW FIRM LLC**
134 Kings Hwy E., 2nd Fl.
Haddonfield, NJ 08033
T: (856) 772-7200
F: (856) 210-9088
klaukaitis@shublawyers.com
jshub@shublawyers.com

Sarah N. Westcot *(Pro Hac Vice)*
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
swestcot@bursor.com

Max S. Roberts*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9189
aobergfell@bursor.com
mroberts@bursor.com

Charles E. Schaffer*
David C. Magagna Jr. *(Pro Hac Vice)*
**LEVIN, SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
cschaffer@lfsblaw.com
dmagagna@lfsblaw.com

* Admitted to the General Bar
** *Pro Hac Vice* Application Forthcoming

***Attorneys for Plaintiffs***